UNITED STATED DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
BRAHM PRASAD, individually and MUMBAI,
INC.,


                              Plaintiffs

                 --Against –

CITY OF NEW YORK, DENNIS DeQUARTRO,
 *individually*, THOMAS LAUTERBORN, individually,
BERNADETTE ENCHAUTEQUI, *individually*
MICHAEL WEINBERGER, individually,
BETH GALTON, *individually*, FRED PHELPS,
Individually, and RON HOLMES, *individually,*

                           Defendants
--------------------------------------------------------X

        **AMENDED COMPLAINT**
        <u>JURY TRIAL DEMANDED</u>
        08-Cv-3818

        Plaintiffs, BRAHM PRASAD, *individually* and MUMBAI, INC., by their

attorneys, LAW OFFICES OF AMBROSE WOTORSON, allege as follows:

        I.     <u>INTRODUCTION</u>

        1.     This is an action to vindicate the civil rights of plaintiffs, a nightclub and a

night club owner. Plaintiffs contend that defendants, through well- orchestrated and

perfectly-coordinated schemes involving local politicians, public agencies, and

community activists, have harassed plaintiffs and have maliciously abused civil process

against plaintiffs in violation of their freedom of association rights, their liberty interests

rights, and their equal protection rights, in part, because the nightclub's patrons were

primarily young, Indo-Caribbean and/or black. These misdeeds are made actionable

through 42 U.S.C. Sections 1981, 1983 and 1985.

        II.    <u>JURISDICTION</u>

        2.     This Court has jurisdiction over this action under 42 U.S.C. Sections 1981,

1983 and 1985. Venue is proper, as the operative events occurred within this judicial district.

III.     PARTIES

3.     MUMBAI, INC. is a "person," and it is a privately-owned company that is incorporated in the State of New York. It may sue and be sued, and its principal place of business was located at 250 West 26th Street, New York, New York, 10001 and at all relevant times, it operated as a cultural arts center and night club located in New York County, New York. MUMBAI hosted wedding receptions, parties, fundraisers, political events, entertainment showcases and live music. Moreover, the venue served as a popular night club which was frequented by a largely young, Indo-Caribbean and/or black clientele.

4.     BRAHM PRASAD, (hereinafter "plaintiff") who resides in Queens County, New York, hereby sues in on his own behalf. At all relevant times, plaintiff served as the owner of MUMBAI, INC.

5.     MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS, at all relevant times, were angry and paranoid white residents of the neighborhood where Mumbai was located. They harassed plaintiffs, sought Mumbai's closure, instigated judicial proceedings against Mumbai, gave utterly false testimony in such proceedings, and sought, improperly, to influence judicial proceedings against Mumbai and its owner, in part, because Mumbai played reggae and soca music, which is popular with young Indo-Caribbean people, and because Mumbai played hip-hop music, which is popular with young African-American people, as well as other young people. However, MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED

PHELPS, viewed the presence of young black males, in particular, as threatening, scary, unsafe and unsanitary. Moreover, WEINBERGER, whom on information and belief, is a lawyer admitted to practice law in the State of New York, uttered vile racial epithets to at least one person associated with Mumbai.

6.      On information and belief, MICHAEL WEINBERGER, BETH GALTON and FRED PHELPS, all reside at 236 West 26th Street, New York, New York. RON HOLMES' address is unknown at this time.

7.      CITY OF NEW YORK, (hereinafter, "municipal defendant") is a state actor for 42 U.S.C. Section 1983 purposes. Defendant may sue and be sued, and its principle place of business is in New York County, New York. At all relevant times, City of New York employed the individual defendants listed herein. They are sued for having violated plaintiffs' civil rights while acting under color of state law and/or acting pursuant to its own practices, customs and policies.

8.      Defendants, DENNIS DeQUARTRO, *individually* and THOMAS LAUTERBORN, *individually*, and BERNADETTE ENCHAUTEQUI, *individually,* at all relevant times, were employed by the City of New York as police officials. However, they are herein sued in their individual capacities for violating plaintiffs' protected civil rights while acting under color of state law and/or acting pursuant to practices, customs and policies of the City of New York.

IV.    FACTUAL AVERMENTS

8.         Defendants violated plaintiffs' civil and commercial rights in the following ways:

a.  Plaintiff, began the start up process for Mumbai, Inc, on or about June to October 2002, by signing a four-month lease deposit of $66,666.68, by posting signs for three (3) months at community board hearings regarding the proposed club and its applying for a liquor license. No alleged community protests were voiced at this time.

b.  As well, construction and renovation of the venue took place between July and December 2002. The costs of this were some $500,000.

c.  The venue officially opened in January 2003, and it initially catered to a largely young Indo-Caribbean clientele who favored, Soca music, Reggae Music, Hip-Hop music and Chutney music.

d.  Mumbai was not the only nightclub located in this neighborhood when it opened. Indeed, nearby clubs, Club Deep on 22nd street and around the corner from Mumbai, and Avalon on West 20th Street, also around the corner from Mumbai, were closed in 2006 for permitting the sale of illegal drugs, including cocaine and ecstasy Steel Gym on 23rd street, around the corner from Mumbai permitted the sale of illegal drugs, but was allowed to stay open.

e.  Early on, Mumbai began catering to a largely young African-American clientele who favored reggae and hip-hop music.

f.  Almost immediately, community protests, largely instigated by
MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and
FRED PHELPS, erupted. The instigation took the form of distributing
false, fear-mongering flyers; making false, fear-inspiring claims at
public meetings, and making similarly outlandish claims to the 10th
precinct, and to sympathetic politicians. Indeed, MICHAEL
WEINBERGER, BETH GALTON, RON HOLMES and FRED
PHELPS "urged" residents to call the police whenever noise "...*or
anything else from the club bothers you.*" Residents were urged to do
MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and
FRED PHELPS this in order to "keep the club in check *and to help
shut it down.*"
Mumbai's doors had only been opened for two months when urged the
residents to undertake these tactics.

g.  MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and
FRED PHELPS  through various communications, meetings and
agreements with Community Board #4, the 10th precinct, and various
"community affairs" officers, conspired to create a record of bogus
and exaggerated complaints to serve as a basis for closing down the
club, and on or about March 3, 2003, urges residents to make such
complaints. Further, MICHAEL WEINBERGER, BETH GALTON,
RON HOLMES and FRED PHELPS urged residents to make such
complaints to Jeremy Hoffman of NYC Council member Christine

Quinn's office, and "Brian," of NY Senator Thomas Duane, because they had the political power to "influence the community board's decision about the club."

h.  In fact, by March 7, 2003, Beth Solomon, of  Community Board #4, and already begun to openly side MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS   against Mumbai, and vetted communications which MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS  intended to have or had with the NYC Department of Community Affairs. Thus, as early as March 7, 2003, management of Community Board #4 was no longer objective with respect to Mumbai, but pretended to be so.

i.  By March 24, 2003, after various urgings and communications with MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS, the Board of Directors of the Capitol Building Loft Corporation, whom on information and belief, owned and/or managed a building close to the club, asked its tenants to complain to the Department of Consumer Affairs, because Mumbai would, amongst other things, *"decrease the value of [their] properties."*

j.  In fact, Michael Weinberger later told Audley Barranco, who handled security for Mumbai, that he (Weinberger) was "…going to get you all niggers out of here, because we don't need you over here; these neighbors know we need you' all to get out of here."

k.  By March 24, 2003, management of Community Board #4 openly
complained to the Department of Consumer Affairs and the New York
State Liquor that Mumbai did not feature "Indian popular culture," but
was an "all night dance club reachable by anyone…"

l.  In fact, the as aforementioned, Mumbai initially featured popular Indo-
Caribbean music which included Chutney music and Bhangra music,
as well as Reggae music and Hip-Hop music. Thus, Community Board
#4 not only objected to the sociologically-vetted definition of "popular
culture," but it clearly objected to the club not being exclusively
Indian.

m.  By April 4, 2003 and May 6, 2003, after various urgings and
communications with MICHAEL WEINBERGER, BETH GALTON,
RON HOLMES and FRED PHELPS, State Senator Thomas Duane,
Assembly member, Richard Gottfried and councilmember Christine
Quinn, complained to the New York City Department of Consumer
Affairs, and falsely claimed, amongst other things, that the Mumbai's
patrons were typically aggressive and impetuous, that they plastered
the sidewalks with vomit and urine, and that Mumbai openly invited
underage alcohol consumption, drinking.

n.  By May 14, 2003, the Department of Consumer Affairs, through Susan
Kassapian, had lost all objectivity, and cited, amongst other things, the
complaints from State Senator Thomas Duane, Assembly member,
Richard Gottfried and councilmember Christine Quinn, in determining

that Mumbai lacked "integrity, honesty and fair dealing among persons

and organizations engaged in licensed activities, for the protection of

the health and safety of the people of New YORK city for other

purposes requisite to promoting the general welfare."

o.  On or about May 30, 2003, the New York City Consumer Affairs

Department padlocked and closed the venue during hours of operation,

No explanation was given at the time of the closing for this actions.

The venue remained closed until July 30, 2003, when the New York

City Consumer Affairs Department agreed to remove the padlock, so

that the club could reopen.

p.  On or about July 21, 2003, councilmember Christine Quinn admitted

that the Department of Consumer Affairs decision had been brought

about, in part, by "close coordination of [her] office, Community

Board 4, the New York Police Department 10th precinct *and* the

Department of Consumer Affairs." (Emphasis supplied). Still, on July

30, 2003, the Department of Consumer Affairs entered into a

settlement agreement with Mumbai, which permitted Mumbai to

continue to operate as an all-night dance club featuring reggae and hip-

hop music, popular with African-Americans and others. Mumbai's

patrons, continued to largely be African-American.

q.  Undeterred, council member Christine Quinn, after various urgings

and communications with MICHAEL WEINBERGER, BETH

GALTON, RON HOLMES and FRED PHELPS petitioned the NYC

Corporation Counsel's Office, and the New York State Liquor

Authority, in September 2003, to take action against Mumbai.

r.  Frustrated, Christine Quinn, after various urgings and communications

with MICHAEL WEINBERGER, BETH GALTON, RON HOLMES

and FRED PHELPS, falsely claimed, on December 8, 2003, that,

"increasingly, residents have experienced unsafe conditions where

*club staff* have harassed women in the area and have also harassed men

who are gay or perceived to be gay in the area." (Emphasis supplied).

Quinn also claimed that her staff was working with New York Police

Department and the New York City Gay and Lesbian Anti-Violence

project to address Mumbai's staff allegedly harassing women and gay

men.

s.  By March 22, 2004, Councilmember Christine Quinn along with one

of her assistants, Danielle DeCerbo, were "coordinating community

board office and other interested parties," to begin registering

complaints with the New York State Liquor Authority concerning

Mumbai.

t.  Thereafter, white residents of the neighborhood where Mumbai was

located, led by MICHAEL WEINBERGER, BETH GALTON, RON

HOLMES and FRED PHELPS, urged residents to come to community

board expressed a desire to "close the [venue] down."

u.  Thereafter, the New York City Police Department began a pattern of

visiting Mumbai and issuing largely bogus summonses. On

information and belief, this was at the direct instigation and behest of MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS.

v.   On information and belief, after various urgings and communications with, and at the behest of, MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS, utterly false testimony was given to the New York State Liquor Authority on or about May 2004, alleging that: Mumbai's patrons had deposited "drug packets" and "hypodermic needles" in the area; that club staff and patrons had threatened gay individuals; and that Mumbai's patrons frequently urinated in local buildings.

w.   Between August and September 2004, plaintiffs closed the venue for renovations which costs around $300,000 for new construction and a décor change.

x.   On or about March 27, 2005, a Captain Dennis De Quattro threatened plaintiff that he would "turn [the club] upside down."

y.   In mid-April 2005, the New York City Police Department set up of a blockade in front of the venue while an event was taking place. The blockade was not a vehicle safety inspection checkpoint or a sobriety checkpoint, but it was specifically designed to deter patrons of the establishment.

z.   The following weekend, during a weekly hip-hop party, the New York City Police Department set up of a blockade in front of the venue. The

blockade was not a vehicle safety inspection checkpoint or a sobriety checkpoint, but it was specifically designed to deter patrons of the establishment, and to quell the "not-in-my-backyard" concerns of the neighborhood's white residents. These weekly blockades continued, unabated. On information and belief, such blockades are a tried and tested custom, practice and policy of the City of New York against minority owned or minority- patronized venues.

aa. On or about May 26, 2005, councilmember Christine Quinn, State Senator Thomas Duane and Assembly member Richard Gottfried, after various urgings and communications with, and at the behest of, MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS, complained to Inspector Dennis Quinn of the 10th Precinct of the New York City Police Department, that, amongst other things, Mumbai was operating as an all night dance club instead of featuring Indian singers, dancers and musicians, and Indian popular culture. Quinn also urged unspecified action against Mumbai.

bb. At the instigation of MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS, some residents continued to offer that they felt intimidated by Mumbai's young patrons.

cc. On information and belief, Mike Petrillo of the New York City Police Department and Beth Solomon of Community Board #4, communicated, agreed and conspired, that letters would be solicited from local residents complaining about Mumbai, so that the City of

New York could take unspecified actions against Mumbai, and so Mumbai could survive any lawsuit by somehow proving that the City of New York acted against Mumbai on the basis of community concerns. On information and belief, this tactic of creating evidence to make it look like actions of the a City of New York were undertaken on the basis of community concerns, is a well-tested practice, custom and policy of the City of New York.

dd. As a consequence of the agreement between Mike Petrillo of the New York Police Department and Michelle Solomon of Community Board #4, MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS solicited complaints against Mumbai in June 2005, which contained numerous false assertions, including, but limited to, false allegations that: there was frequent violence at the club; that patrons frequently urinated on the street; that patrons frequently brought and sold drugs openly in front of Mumbai; that young men frequently loitered in front of surrounding buildings and somehow presented a "danger" to young girls. Thereafter, the City of New York, through the New York City Corporation Counsel's Officer, undertook a nuisance abatement action against Mumbai based, largely upon the aforementioned complaints that were solicited, and based upon summons that were dismissed on the merits, but which were issued by, or under the direction or supervision of Deputy Inspector Dennis DeQuartro, Lieutenant Theodore Lauterborn, and Police

Officer Bernadette Enchautequi. Each summons was false, was issued without probable cause, and the nuisance abatement action itself was terminated as settlement on November 10, 2005 in which neither Mumbai nor Brahm Prasad conceded any liability or wrongdoing.

ee. On or about November 25, 2005, Mumbai obtained additional age-verification devices which it used, proactively, until its closure.

ff. On information and belief, the City of New York, after various communications and agreements with MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS, and along with them, managed to place considerable pressure on Mumbai's landlord. In fact on December 16, 2005, Allen F. Schwartz, Esq., a deputy managing attorney with the New York Police Department, in a naked abuse of power, sent Mumbai's landlord a letter threatening to sue him because Mumbai was allegedly not in compliance with a settlement agreement. Thus, on or about December 29, 2005, the landlord capitulated and in a cowardly manner, sought to evict Mumbai from its rented space.

gg. At around the same time, defendants Ron Holmes and Michael Weinberger brought separate private nuisance lawsuits against Mumbai and Brahm Prasad, both of which were frivolous, and both of which were eventually withdrawn.

hh. Experts hired by Mumbai, Newman, Donnelly, Nieto and Prestigiacomo determined, after scientific testing, that the various

complaints from MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS were pretextual and greatly exaggerated, since noise level heard from Mr. Weinberger's home was normal and within the range of a New York City apartment. The New York City Department of Environmental Protection concurred.

ii.  On January 10, 2006, the City of New York, through the New York Police Department, sought to improperly influence the outcome of, and to "join" Ronald Holmes private nuisance case which was before Justice Rosalyn Richter, whom, upon information and belief, and had previously received considerable political support from councilmember Christine Quinn, State Senator Thomas Duane and Assembly member Richard Gottfried.

jj.  On January 17, 2006, after various urgings and communications with, and at the behest of, MICHAEL WEINBERGER, BETH GALTON, RON HOLMES and FRED PHELPS, councilmember Christine Quinn, State Senator Thomas Duane and Assembly member Richard Gottfried urged the New York State Liquor Authority to revoke Mumbai's liquor license.

kk. Between March 2, 2006 and  September 4, 2006 MICHAEL WEINBERGER, BETH GALTON, RON HOLMES, FRED PHELPS, councilmember Christine Quinn, State Senator Thomas Duane and Assembly member Richard Gottfried, improperly sought to influence the New York State Liquor Authority and the New York City

Department of Consumer Affairs with false information that was *de hors* any recognized record, by writing directly to the Chairman of the SLA, by writing to the Department of Consumer Affairs, and by soliciting letters falsely complaining about alleged unruly crowds at Mumbai, amongst other things.

ll.  All of the aforementioned letters and complaints were solicited, carefully-orchestrated and well-coordinated by 2006 MICHAEL WEINBERGER, BETH GALTON, RON HOLMES, FRED PHELPS, councilmember Christine Quinn, State Senator Thomas Duane, Assembly member Richard Gottfried, Michelle Solomon of Community Board #4, Mike Petrillo of the NYPD and Allen Schwartz of the NYPD, all acting in concert with each other and in furtherance of common schemes to drive Mumbai out of business.

mm.  On June 15, 2006, a contractor was hired to provide additional sound-proofing services to Mumbai. On or about September 11, 2006 and September 12, 2006, State Senator Thomas Duane and councilmember Christine Quinn improperly sought to influence Justice Rosalyn Richter -- whom, on information and belief, had previously received considerable political support from State Senator Thomas Duane and councilmember Christine Quinn --  with false information that was *de hors* any recognized record, by writing directly to Justice Richter about a pending case, the Chairman of the SLA, by writing to the Department of Consumer Affairs, and by soliciting letters falsely

complaining about noise and alleged unruly crowds at Mumbai,
amongst other things

nn. Moreover, in February 2006 the New York State Liquor Authority
simultaneously began to prosecute numerous cases that arose out of
the largely bogus and pretextual summonses issued by the New York
City Police Department. Almost all of the witnesses against plaintiffs
in the State Liquor Authority prosecutions were police officers with
the NYPD, and white residents from the neighborhood where Mumbai
was located.

oo. On April 24, 2006, Administrative Law Judge Alvin Kessler
concluded that the State Liquor Authority charges against Mumbai for
under-aged drinking were unfounded and that testimony by New York
City police officers simply lacked credibility. The Court also
suggested that at least one police document offered into evidence
during the hearing appeared to be fraudulent. However, on or about
June 7, 2006, Thomas J. Donohue, counsel to the New York State
Authority, acting upon pressure exerted by MICHAEL
WEINBERGER, BETH GALTON, RON HOLMES, FRED PHELPS,
councilmember Christine Quinn, State Senator Thomas Duane,
Assembly member Richard Gottfried, Michelle Solomon of
Community Board #4, Mike Petrillo of the NYPD and Allen Schwartz
of the NYPD, all acting in concert with each other and in furtherance
of common schemes to drive Mumbai out of business,  urged

16

recommended that all of Judge Tessler's findings be adopted, but that his conclusion be rejected, that the State Liquor Authority charges against Mumbai be sustained, and that Mumbai's liquor license be revoked. On August 9, 2006, the Chairman of the New York State Liquor Authority revoked Mumbai's license, and completely ignored ALJ Tessler's decision. Upon information and belief, this decision, which is not supported by Judge Tessler's factual conclusions, resulted, solely and improperly from all of the aforementioned pressure applied by MICHAEL WEINBERGER, BETH GALTON, RON HOLMES, FRED PHELPS, councilmember Christine Quinn, State Senator Thomas Duane, Assembly member Richard Gottfried, Michelle Solomon of Community Board #4, Mike Petrillo of the NYPD and Allen Schwartz of the NYPD, all acting in concert with each other and in furtherance of common schemes to drive Mumbai out of business.

9.     Upon information and belief, defendants have undertaken similar actions against other establishments that are primarily owned and operated by Indo-Caribbean people,  or which cater to a people of Caribbean descent, African -Americans reggae  or  "hip hop" crowds. Defendants' pattern of harassment had one goal in mind: to Mumbai drive out of business and to prevent the peaceful assembly of minorities of East Asian descent, people from the Caribbean, or a minority "hip hop" crowd who wished to openly associate with each other, for the purposes of socializing and networking. In fact, as a direct result of defendants' harassment, the venue was permanently closed down on

bogus claims made by the New York City Police Department and white residents from the Neighborhood where plaintiffs operated.

10.    Defendants' illegal actions were undertaken pursuant to municipal defendants' customs, practices and policies.

11.    Moreover, plaintiffs' rights with respect to malicious abuse of process, liberty interests, and the commerce clause are clearly established, and reasonable persons employed by the City of New York are aware of these rights, or have reasons to be so aware of these rights.

12.    As a further proximate result of defendants' illegal acts towards plaintiffs, plaintiffs have suffered a substantial and permanent loss of revenue.

13.    As a further proximate result of defendants' illegal actions towards plaintiffs, plaintiffs have suffered substantial and permanent impairment and damage to their good names and reputations.

14.    As a further proximate result of defendants' illegal actions, the individual plaintiff, has suffered mental anguish and emotional injury.

15.    Individual defendants' illegal actions were outrageous and were malicious, and were intended to injure plaintiffs, and were done with reckless indifference to plaintiffs' protected rights, entitling plaintiffs to punitive damages as against all individual defendants herein.

16.    Plaintiffs have not previously litigated the instant claims that charges and/or previous  administrative actions against them were malicious and were motivated, in part, by racial animus, and that the relevant rules and regulations were selectively enforced against them, in part, because their patrons were largely African-American.

V.    CAUSES OF ACTION

FIRST CAUSE OF ACTION

16.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

17.    The defendants violated the Fourth and Fourteenth Amendments of The United States Constitution by maliciously prosecuting and by maliciously abusing process against plaintiffs because of the race of its owner, and the races of the patrons that Mumbai primarily served. These violations are made actionable through 42 U.S.C. Sections 1981, 1983 and 1985.

SECOND CAUSE OF ACTION

18.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

19.    The defendants violated the Fourteenth Amendment of The United States Constitution by maliciously curtailing plaintiffs' rights to freely engage in commerce, because of the race of Mumbai's owner, and the races of Mumbai's patrons. These violations are made actionable through 42 U.S.C. Sections 1981, 1983 and 1985.

THIRD CAUSE OF ACTION

20.    Plaintiffs hereby repeat and reallege each allegation in each numbered paragraph above.

21.    The defendants violated the First Amendment of the United States Constitution by curtailing rights of association and assembly of Brahm Prasad and Mumbai, by attempting to limit the types of patrons  with whom Mumbai  and Prasad associated with , and by curtailing the types of popular  music that Mumbai played and

Prasad authorized be played. These violations are made actionable through 42 U.S.C.

Sections 1983 and 1985

<u>FOURTH CAUSE OF ACTION</u>

22.    Plaintiffs hereby repeat and reallege each allegation in each numbered

paragraph above.

23.    Defendants have undertaken a pattern of harassment, false summons,

curtailment of commercial activities, malicious abuse of process, illegal searches against

plaintiffs because they are minorities, because they catered to African-Americans, people

from the Caribbean and because the catered to a minority reggae and "hip hop" crowd.

Defendants have not typically undertaken such actions against establishments that are not

minority or owned, that do not cater to African-Americans, people from the Caribbean,

and that do not cater to a reggae or "hip hop" crowd. Defendants are unable to offer any

rational basis for this disparity. Thus, defendants have violated the Equal Protection

Clause of the 14th Amendment. These actions are made actionable by 42 U.S.C. Section

1981, 1983 and 1985.

VI.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, plaintiffs pray that this Court grant to him judgment containing the

following relief:

a.    Injunctive Relief;

b.    An award of damages to be determined at the time of trial to compensate

plaintiffs for mental anguish, humiliation, embarrassment, and emotional

injury;

c.      Awards of punitive damages to be determined at the time of trial as

        against each individual defendant;

d.      Awards of reasonable attorney fees and the costs of this action and,

e.      Such other and further relief as this Court may deem just and proper.

Dated: Brooklyn, New York
        August 4, 2008


                        Respectfully Submitted,
                        Law Offices of Ambrose Wotorson

                        By_____/s/_____
                        Ambrose W. Wotorson (AWW-2412)
                        26 Court Street, Suite 1811
                        Brooklyn, New York 11242